UNITED STATED DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| COX OKLAHOMA TELECOM, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. |
| v. | ) |
| | ) |
| GENERAL SERVICES ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COX OKLAHOMA TELECOM, LLC'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER

Plaintiff, Cox Oklahoma TeleCom, LLC, ("Cox")by and through counsel, files

this memorandum of law in support of Cox's application for temporary restraining order.

### INTRODUCTION

This request for a temporary restraining order arises in a "reverse FOIA" action

under the Freedom of Information Act ("FOIA"), challenging the decision of the General

Services Administration ("GSA") to provide Cox's confidential pricing information to a

major competitor in an ongoing bidding process for a government telecommunications

contract (the "Contract"). GSA's planned disclosure would violate federal statues and

regulations and would cause immediate and irreparable harm to Cox, the government

bidding process and the public interest.

Cox competes on a continual basis with Southern Bell Companies ("SBC") and

others for service awards under the Contract. The highly-regulated government bidding

process protects the confidential pricing information of all bidders under the Federal

Acquisition Regulations (the "FARs") to ensure fair competition. SBC has attempted to

circumvent that process by seeking Cox's competitive pricing information under FOIA,

but FOIA expressly exempts such information from disclosure and the FARs require

GSA to honor that exemption. Inexplicably (because GSA has not addressed Cox's

timely and detailed objections), GSA intends to provide this confidential and proprietary

pricing information to SBC on Friday, April 7, 2006. GSA's action is improper because

the information clearly falls within FOIA Exemption 4 and the Trade Secrets Act, both of

which prohibit the disclosure of such information.

Unless GSA is immediately enjoined by this Court, Cox's confidential pricing

information will become known to its competitor, and Cox will be placed at a significant

and unfair competitive disadvantage in the continued bidding process under the current

Contract, as well as in the bidding for upcoming GSA contracts. Cox respectfully

requests that this Court grant emergency relief in the form of a temporary restraining

order to prevent the unlawful disclosure of such information until such time as this Court

shall hear Cox's motion for a preliminary injunction.

## FACTUAL BACKGROUND

### I. The GSA Bidding Process For Oklahoma Markets

In April 2004, GSA began soliciting competitive bids for the provision of

telecommunications services, including voice and data services, for the United States

Government in the Texas, Oklahoma and Arizona markets. (Affidavit of Roger Burnett

dated April 5, 2006 ("Burnett Aff.") at ¶ 4.) In response to GSA's solicitations, in

November 2005, Cox submitted bids as an Offeror pursuant to GSA contract

GS07T06BGD003 (the Oklahoma Service Contract" or "Contract") to provide voice and

data services within the Tulsa and Oklahoma City markets in Oklahoma. (Burnett Aff. at

¶ 5.) The GSA has informed Cox that Southern Bell Companies ("SBC"), a subsidiary of

AT&T Corporation ("AT&T"), also submitted bids as an Offeror pursuant to the Contract

in the Tulsa and Oklahoma City markets. (Burnett Aff. at ¶ 6.) SBC and AT&T are

major competitors with Cox in the market for local voice and data services in the

Oklahoma markets and across the nation. (Burnett Aff. at ¶ 7.)

Under the provisions of the Contract, the right to be the telecommunications

provider for various federal agencies needing telecommunications services would be

awarded in phases, with different portions of the contract being awarded each quarter,

beginning in the first quarter of 2006 and continuing through at least the first quarter of

2007 (the "Award Period").[1]  (Burnett Aff. at ¶ 8.)  During the second quarter of 2006,

GSA made a small number of awards for federal agencies for which the parties had

placed bids for required telecommunications services under the Contract.  Most of the

awards for federal agencies under the Contract have not yet been made, and are the

subject of ongoing competition. (Burnett Aff. at ¶ 9.)

As is typical with a public works bidding process, the Offerors submit non-public,

sealed bids that are not disclosed to competing Offerors.  (Burnett Aff. at ¶ 10.)  Each

federal agency award under the Contract is made to the Offeror who offered the lowest

service price. (Burnett Aff. at ¶ 11.)

The Contract provides for a two-year contractual base period from the date of

award of a given federal agency, during which time the winning Offeror will provide the

---

[1]     GSA's fiscal year begins on October of the preceding calendar year and runs
through September of the stated calendar year.  Hence, the first fiscal quarter of 2006 ran
from October 1, 2005 through December 31, 2005.

services to the agency. (Burnett Aff. at ¶ 12.) Following the two-year base period, the

Contract provides for three one-year options, during which time the required

telecommunications services could be awarded to another competitor who offered a

lower price. (Burnett Aff. at ¶ 12.) The Contract provides that an Offeror may reduce its

Contract prices at any time during the life of the Contract. (Burnett Aff. at ¶ 13.) A

reduction of price during the base year period could affect the award of the option period

services, as well as the award of additional agencies under the base period. (Burnett Aff.

at ¶ 13.)

Because awards for federal agencies under the Contract are being made on a

continuing basis during the Award Period, an Offeror's lowering of its Contract prices

during the Award Period would result in a new reduced price for consideration by the

GSA. (Burnett Aff. at ¶ 14.) Therefore, an Offeror can improve its competitive position

if it reduces its Contract prices below the Contract prices of its competitors during the

Award Period. (Burnett Aff. at ¶ 15.) For all of these reasons, disclosure of Cox's

pricing information to SBC, or any other competitor, would place Cox at a competitive

disadvantage in the bidding process for awards not yet made, as well as for systems to be

awarded during the option period. (Burnett Aff. at ¶ 16.)

**II.    SBC's FOIA Request for Cox's Pricing Information Under the Contract.**

On December 21, 2005, GSA requested redacted pricing information from Cox,

without indicating that such information was being requested so that it could be made

public. (Burnett Aff., Exhibit B.) On or around December 28, 2005, Cox provided the

information requested by GSA, redacting all of the pricing information included in the

pricing schedules. (Burnett Aff. at ¶ 19.)

On January 3, 2006, GSA sent a letter to Cox stating that it would be releasing certain redacted information provided by Cox from the pricing schedules. (Burnett Aff. Exhibit C.) GSA's January 3, 2006 letter purported to include the information that GSA had decided to release. (Id.) All that was enclosed with the letter were the redacted pages that Cox had sent to GSA, which did not include any of Cox's confidential pricing information. (Burnett Aff. at ¶ 21.) Cox did not object to the release of such information since only the redacted pages were being provided.

On February 28, 2006, GSA sent another letter to Cox stating that SBC had made a FOIA request for Cox's confidential pricing information and announcing that GSA intended to release "additional information" to SBC. (Burnett Aff., Exhibit D.) Prior to that time, GSA had never provided Cox with the notice and opportunity to object to disclosure of information under FOIA that is required under 41 C.F.R. § 105-60-501. Upon review of GSA's February 28, 2006 letter, it became apparent to Cox that GSA intended to provide Cox's complete pricing schedule under the Oklahoma Service Contract to SBC without any information redacted, despite the fact that current year and option year pricing information was still the subject of a continual competitive bidding process. (Burnett Aff. at ¶ 23.)

On March 1, 2006, Cox responded by e-mail to GSA's February 28, 2006 letter, stating that Cox strongly objected to GSA releasing Cox's confidential pricing information under the Oklahoma Services Contract to SBC. (Burnett Aff., Exhibit E.) The March 1, 2006 e-mail response to GSA made clear that GSA's disclosure threatened Cox's competitive position, as Cox explained that, "We strongly feel that providing this

pricing information [would] give our biggest competitor a major advantage in future

government contract awards and possibly the awards under the current [] contract." (Id.)

Later on March 1, 2006, GSA sent Cox another letter asking that Cox provide the

following information to support its objection:

    a.  The specific information that Cox believed should not be released;

    b.  Cox's reasons for not wanting the information released; and

    c.  Any actions taken by Cox to avoid public disclosure of such information.

(Burnett Aff., Exhibit F.) GSA gave Cox until March 8, 2006 to provide the information

requested in GSA's March 1, 2006 letter. (Id.)

On March 7, 2006, Cox responded to GSA's March 1, 2006 letter, providing

detailed and specific answers to each of GSA's requests. (Burnett Aff, Exhibit G.) On

March 31, 2006, GSA informed Cox in a one-page letter, without any explanation of its

reasoning or any rebuttal of Cox's points, that GSA intended to release the information in

five working days. (Burnett Aff, Exhibit H.) Subsequently, GSA informed Cox that it

intended to disclose the information on Friday April 7, 2006. (Burnett Aff. at ¶ 23.)

GSA's March 31, 2006 letter did not respond to any of Cox's arguments and did

not even acknowledge receipt or consideration of Cox's March 7, 2006 letter reflecting

the reasons why the pricing information should not be released. (Burnett Aff, Exhibit H.)

In fact, GSA's letter erroneously stated that Cox had not "described how this data

revealed any proprietary or commercially confidential information." Id. Finally, the

GSA letter claimed a "U.S. court decision dated September 7, 2001 between Sprint

Communications Company and GSA ...established the precedence [sic] to release the

first year pricing of our telecommunication [sic] contracts of which GSA is currently

following." (Id.)

### III.    Release of the Bidding Information Will Result in Immediate and Irreparable Competitive Harm to Cox.

As described in detail in Cox's March 7, 2006 letter to GSA, release of Cox's

confidential pricing information under the Contract will result in immediate and

irreparable harm to Cox's competitive position in both the Oklahoma markets and other

markets across the country. (Burnett Aff, Exhibit G.)  Given the ongoing nature of

awards under the Contract, GSA's full disclosure of Cox's pricing information would

provide a competitive advantage to SBC, Cox's direct competitor under this Contract,

and Cox's likely competitor under future GSA contracts.  (Id.)  Cox's pricing under the

Contract was established without Cox having any knowledge of or regard for the pricing

information of other Offerors, including SBC.  (Id.)  Cox's pricing information was

submitted pursuant to Federal Acquisition Regulations that explicitly make confidential

pricing information undisclosable.  See, e.g., 48 C.F.R. 15.503; 48 C.F.R. 15.506.

Disclosure of Cox's pricing information to SBC would prejudice Cox in several

ways, including, among other things:

    d.  allowing SBC to artificially bid for and set prices in an anticompetitive manner by minimally underbidding Cox for GSA's contracts;

    e.  triggering an iterative process of competitors requesting pricing information under FOIA, which would undermine the process established in the FARs and result in an anticompetitive "ratchet-down" of prices as competitors would continually lower their prices to secure future awards under the Contract;

    f.  giving SBC a substantial anticompetitive advantage over Cox and other biddersin bidding for services in other GSA contract regions yet to be bid, including California, Arizona, Louisiana and Kansas.

(Burnett Aff, Exhibit G.)  Providing Cox's competitive bidding information to one of

Cox's primary competitors during the bidding process would have a significant

anticompetitive and unfair effect on what is supposed to be a competitive bidding

process.  (Burnett Aff at ¶ 36.)  Moreover, once disclosed to SBC, Cox's confidential

information could be provided to other competitors of Cox, including competitors

involved in the GSA bidding process.  (Burnett Aff at ¶ 37.)

The information requested by SBC is not publicly available.  (Burnett Aff at ¶

37.)  Because of its confidential nature, Cox takes a variety of measures to protect it from

public disclosure, including, but not limited to: (1) complying with State and Federal

laws relating to the non-disclosure of confidential information; (2) determining the

pricing information without assistance from outside parties; (3) disclosing the pricing

information within Cox only on a "need-to-know basis;" (4) not making the information

available for public review; and (5) not posting the pricing information on Cox's web

site.  (Burnett Aff at ¶ 38.)  In fact, the phrase **"Proprietary not to be disclosed outside**

**the Government"** was stamped <u>by GSA itself</u> in bold lettering across the bottom of

every page of the pricing schedules.  (Burnett Aff at ¶ 39.)

Unlike some other government contracts on which GSA accepts bids, this is not a

"one-time" single vendor award to be rebid upon expiration of the contract.  (Burnett Aff

at ¶ 40.)  In that type of contract, the historical first-year price paid by the government

might possibly be subject to disclosure.  This Contract, however, is still in a competitive

situation because not all systems under the Contract will be awarded until at least 2007

and because there are three one-year options under the Contract.  This gives the

government the opportunity to switch to a lower bidder at the expiration of the two-year

base period, and on an annual basis thereafter. (Id.) Providing Cox's pricing information to SBC would allow SBC to determine exactly how much it would need to lower its bids to underbid Cox by the smallest amount possible, thereby disrupting what is an otherwise competitive bidding process. (Id. at 41.)

The harm to Cox would be immediate and irreparable, because GSA has stated its intention to release this pricing information to SBC on Friday, April 7, 2006 and because, once released, it would be impossible for GSA to retract the information provided to SBC in any meaningful manner. (Id. at 42.)

## ARGUMENT AND CITATION TO AUTHORITY

I.  **Cox Satisfies the Standard for Issuance of a Temporary Restraining Order.**

A temporary restraining order should be issued to protect a plaintiff where:

(1)    The plaintiff has a substantial likelihood of success on the merits;

(2)    Without the relief, the plaintiff faces an imminent threat of irreparable harm;

(3)    The temporary restraining order is unlikely to substantially injure other parties; and

(4)    The injunction would further the public interest.

Al-Fayed v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001). The above requirements for a temporary restraining order are not independent prerequisites but factors to be evaluated on a sliding scale approach. Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998). Thus, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995). Where the moving party is seeking to maintain the status quo, the Court should avoid an "exaggeratedly refined analysis of the merits at an early stage in the litigation." Wash. Metro. Transit Comm'n

v. Holiday Tours, 559 F.2d 841, 844 (D.C. Cir. 1977). As set forth below, Cox clearly

meets these requirements.

### A.    Cox has a Substantial Likeliood of Success on the Merits.

In a reverse FOIA action initiated pursuant to the Administrative Procedures Act

("APA"), 5 U.S.C. 701, et seq., a party will succeed on the merits if it can demonstrate

that an agency decision was "arbitrary and capricious, an abuse of discretion, or not in

accordance with law." 5 U.S.C. § 706(2)(A). See also Mallinkrodt Inc. v. West, 140 F.

Supp.2d 1, 4 (D. D.C. 2000). Here, Cox has a substantial likelihood of success on the

merits for at least two independent reasons:

> (1) GSA's decision to release Cox's confidential pricing information is arbitrary
> and capricious in that GSA did not provide any justification for its actions and
> did not acknowledge or address the arguments made by Cox; and

> (2) GSA's decision to release Cox's confidential pricing information is not in
> accordance with law because it violates the Federal Acquisition Regulations
> and the Trade Secrets Act, 18 U.S.C. § 1905.

For all of these reasons, Cox has demonstrated a substantial likelihood of success

on the merits of this action.

### (1) GSA's decision to release Cox's confidential pricing information is arbitrary and capricious.

An agency's action is arbitrary and capricious where it is not supported by

substantial evidence in an agency record. Eagle Healthcare v. Shalala, 52 F.Supp.2d

1 (D. D.C. 1999). Specifically, where confidential pricing information is at issue, the

agency must provide a sufficient reason for its refusal to withhold such information on

the administrative record or else the agency will be precluded from providing a "post hoc

rationalization for the first time at the district court level." AT&T Info Sys. v. GSA, 810

F.2d 1233, 1236 (D.C. Cir. 1987). Where an agency fails to consider the relevant factors

before reaching a decision, the agency's action is arbitrary and capricious. National

Wildlife Federation v. Norton, 332 F.Supp.2d 170 (D.D.C.,2004).

The GSA in this case has failed to rebut any of Cox's evidence and has failed to

place any evidence of its own on the record to support its position. Instead, GSA simply

(and erroneously) concluded that Cox had not "described how this [pricing] data reveals

any proprietary or commercially confidential information." GSA then relied solely for its

reasoning and explanation on the conclusory statement that, "We have determined that

release of the requested records would not cause your company substantial competitive

harm."

Cox proffered detailed, clear and well-supported responses to the GSA's March 7

letter and GSA was obligated to consider and address them reasonably on the record.

GSA has utterly failed to provide a sufficient reason for its decision not to withhold the

information, and could not provide a "post hoc rationalization" of its decision even if it

had one. See AT&T Info Sys., 810 F.2d at 1236. Based on the administrative record that

is present, it is clear that GSA did not consider the relevant factors raised by Cox prior to

reaching its decision.

**(2) GSA's decision to release Cox's confidential pricing information is not in accordance with law.**

FOIA's Exemption 4 prohibits disclosure of "trade secrets and commercial or

financial information obtained from a person [that is] privileged or confidential." 5

U.S.C. 522(b)(4). See also Mallinkrodt, 140 F. Supp.2d at 4. Although FOIA's

exemption typically is permissive, the Trade Secrets Act and the Federal Acquisition

Regulations independently prohibit disclosure of the information covered by FOIA

Exemption 4. See, e.g., 48 C.F.R. §§15.503 and 15.506. See Mallinkrodt, 140 F.

11

Supp.2d at 4, 6. Information is "confidential" for purposes of FOIA Exemption 4 if its

release would cause substantial harm to the competitive position of the plaintiff. National

Parks & Conservation Ass'n v. Morton, 498 F.2d 765 (D.C. Cir. 1974). See also MCI

Worldcom, Inc. v. General Services Admin., 163 F.Supp.2d 28, 35 (D. D.C. 2001).

Because the information at issue here is confidential business information covered by

FOIA Exemption 4, its disclosure would be contrary to law. See Id.

The information GSA plans to disclose would place Cox at a significant

competitive disadvantage if released to SBC. The Oklahoma Service Contract[2] at issue in

the present case provides for awards of services to federal agencies to take place between

the second quarter of 2006 and the first quarter of 2007. (Burnett Aff. at ¶8.) Over the

course of the Award Period, any Offeror may lower its prices under the Contract, thereby

improving its competitive position for any federal agency awards that had not been made.

(Burnett Aff. at ¶13-15.) In addition, at the expiration of the two-year base period under

the contract, GSA has three one-year options that it may exercise. (Burnett Aff. at ¶12.)

Because Cox's option-year prices are included in the information that GSA has proposed

releasing, Cox would be at a competitive disadvantage with respect to awards of services

to federal agencies during the option years because SBC would know the exact amount of

Cox's option-year bids under the Contract. (Burnett Aff. at ¶13.)

In its March 7, 2006 letter to GSA, Cox fully articulated the competitive

disadvantage that it would face if its confidential pricing information were disclosed to its

---

[2]    In addition to the competitive disadvantage to Cox with respect to the Oklahoma
Service Contract, Cox likewise would suffer substantial competitive harm in other
markets where GSA intends to open similar bidding on similar services to federal
agencies, including the Arizona, California, Louisiana and Kansas markets. (Burnett Aff.
at ¶35(c).)

major competitor, SBC.  Nevertheless, without explanation or rebuttal of the points raised

by Cox, GSA stated in its March 31, 2006 response that Cox never "described how the

data reveals any proprietary or commercially confidential information."[3]  GSA went on to

state in conclusory fashion that, "We have determined that release of this information

would not cause your company substantial competitive harm."  GSA's letter then stated

that, "The determination is based on a U.S. court decision dated September 7, 2001,

between Sprint Communications Company and GSA that established the precedence [sic]

to release the first year pricing of our telecommunications [sic] contracts of which GSA is

currently following."  The case referenced in GSA's letter is MCI Worldcom Inc. v.

GSA, 163 F. Supp.2d 28 (D. D.C. 2001).  It is apparent, however, that this case provides

no support for GSA's decision to release Cox's pricing information.  In fact supports

Cox's position that the information in the present case cannot be disclosed by GSA.

     In MCI Worldcom, the plaintiffs brought a reverse FOIA action to prevent the

disclosure of nearly identical information to the information GSA plans to disclose here.

See MCI Worldcom, 163 F. Supp.2d at 30-31.  MCI Worldcom had entered into a eight-

year contract to provide long distance telecommunications services to various federal

agencies.  Id. at 30.  In the second year of the contract, GSA announced to MCI

Worldcom that it would be releasing "all contract unit prices contained in the []

Contract."  Id.  GSA relied on the language of FAR §§15.503(b)(1) and 15.506(d)(2),

which provide for the disclosure of unit pricing to "unsuccessful offerors" where such

information does not constitute FOIA Exemption 4 confidential information.  The court

---

[3]    In fact, GSA explicitly recognized the confidential and proprietary nature of the
Contract pricing schedules by stamping in bold print at the bottom of each page of the
pricing schedules, "**Proprietary not to be disclosed outside the Government.**"

explained that the FARs do not authorize the disclosure of unit pricing if such pricing

constitutes FOIA Exemption 4 confidential information.  In addition, the court went on to

hold that the pricing information at issue did constitute FOIA Exemption 4 confidential

information.  In reasoning identical to Cox's reasoning here, the court stated:

> First and foremost, this Circuit has held that line-item pricing
> information similar to that at issue here is exactly the type of
> information that constitutes "confidential commercial or financial
> information," and is not disclosable in response to a FOIA request.
>
> ***
>
> [D]isclosure of detailed pricing data…submitted in anticipation of
> being awarded a federal contract would result in "substantial
> competitive harm" because it would permit underbidding by
> competitors and encourage non-governmental customers to
> "ratchet-down" prices.

MCI Worldcom, 163 F. Supp.2d at 30-31 (emphasis added) (internal citations

omitted).[4]  The court likewise held that the release of such information by GSA

would violate the Trade Secrets Act. Id. at 37.

Based on Cox's persuasive and unrebutted description of the substantial

competitive harm that would result from disclosure, as well as on the single

authority cited by GSA, it is apparent that Cox's confidential pricing information

constitutes confidential business or financial information under FOIA Exemption

---

[4]     GSA's assertion that the MCI Worldcom opinion somehow provides precedent
for GSA's decision to provide first-year pricing is both incorrect and irrelevant.  GSA's
position is incorrect because the MCI Worldcom court merely referred to GSA's prior
policy of releasing current year pricing information available and did not provide any
opinion regarding the propriety of disclosing such information.  [**CITE**]

    GSA's position is irrelevant because: (1) the information at issue in this case is
substantially different, because there is competitive bidding based on current year prices
under the contract and awards are being provided through the first quarter of 2007; and
(2) GSA has proposed releasing all of Cox's confidential pricing information, not just the
current year pricing.

4, FARs §§15.503 and 15.506 and the Court's reasoning in <u>MCI Worldcom</u>. As

such, GSA is prohibited from releasing such information.

**B.    Cox Will be Immediately and Irreparably Harmed if a Temporary Restraining Order is not Granted.**

Because confidential information, once released outside the government, loses its

confidential status, courts have held that the disclosure such information would constitute

irreparable harm requiring injunctive relief. <u>See</u> <u>Metro. Life Ins. Co. v. Usery</u>, 426

F.Supp. 150, 172 (D. D.C. 1976). The <u>Usery</u> court stated:

> <u>The  disclosure of those portions of the documents containing exempt  information  would  irreparably  injure  the  [submitting company].</u>

<u>Id</u>. The disclosure of such information to SBC presents the classic example of the bell

that cannot be unrung.

With respect to SBC, the disclosure of Cox's confidential pricing information

would result in the loss of the confidentiality of that information forever.  Once disclosed

to SBC, Cox's confidential pricing information could be made available for all of the

public to see.  This injury would be immediate, because GSA has informed Cox that it

intends to release the information on Friday, April 7, 2006, and the bidding process is

continual.  Thus, unless this Court grants a temporary restraining order, the confidential

nature of this information could be lost before this Court had an opportunity to hold a

hearing on Cox's motion for a preliminary injunction.  The Court should place great

weight on the significant and irreparable harm that will result absent the issuance of a

temporary restraining order, and thereby grant Cox's motion for issuance of a temporary

restraining order under the sliding scale balancing approach to the factors necessary to

prevail on a motion for a temporary restraining order.

**C. No Harm Will Result to the Government or Other Parties by Delaying
Disclosure of Cox's Confidential Pricing Information.**

The government and other parties have no interest in the immediate public

availability of Cox's pricing information.  In contrast to Cox, which would be

immediately and irreparably harmed by the release of this information and as such there

would be no harm to GSA or other parties if the disclosure of this information was

delayed until this Court has time to hear Cox's preliminary injunction motion.  GSA has

never released this information before.  Indeed, absent SBC's FOIA request, GSA would

not have made and could not lawfully make this information publicly available on its

own.  As such, there is no basis for GSA to claim any harm arising from this temporary

restraining order.

Moreover, SBC cannot demonstrate any legitimate harm that would result from

delaying the disclosure of this information until this Court is able to hold a hearing on

Cox's preliminary injunction for at least two reasons.  First, SBC has no legitimate

interest in obtaining or using Cox's confidential pricing information.  The bidding

process under the Contract is governed by the FARs and require that pricing information

be kept confidential while competitive bidding is in progress.  SBC has no basis for

obtaining such information.  Frankly, SBC's attempt to circumvent the sealed bid process

through FOIA is surprising, especially given the clear decision in MCI Worldcom.  The

only reason SBC might want this information would be to underbid Cox by the lowest

amount necessary, a clearly anti-competitive purposes, and this Court should not

recognize any harm that might result to SBC as a result of its inability to take part in anti-

competitive activities. Second, SBC has waited nearly four months for the requested

pricing information, and a further delay to review the propriety of the disclosure which

cannot be undone cannot possibly harm SBC. Indeed, it is not clear that any additional

awards under the Contract were imminent in the next 10 to 20 days, and even if an award

was imminent, the Court could remedy any potential harm to SBC be requiring GSA to

postpone any such awards until after a preliminary injunction hearing.

**D.     The Public Will Benefit From Delaying Disclosure of Cox's Confidential Pricing Information.**

The public interest is best served by a government contract bidding process that is

fair and competitive. Recognition of this public interest is implicit in FOIA Exemption 4,

FAR process, and the Trade Secrets Act, all of which forbid disclosure of confidential

business information provided pursuant to confidential bidding. The public interest

would also be harmed by the provision of Cox's pricing information to SBC, because

such information would allow SBC to engage in anticompetitive bidding. If SBC is

provided with Cox's confidential pricing information, SBC would be able to determine

the exact amount by which it would need to lower its prices in order to underbid Cox.

This type of anti-competitive pricing would allow SBC to reduce its prices by the

minimum amount necessary to underbid Cox, and would thereby reduce the public

benefit created by a sealed, confidential bidding process.

The federal government has established a sealed bidding process for awards under

the contract, and neither SBC nor GSA can alter that now. Releasing Cox's confidential

pricing information to SBC would likely set off an ongoing process of competitors

requesting such pricing information and underbidding one another, resulting in an anti-

competitive "racheting down" of prices. Competitors would be continually forced to

lower their prices in order to secure future awards under the Contract. This race to the

bottom would ultimately lead competitors to exit the market as the prices were driven

down below each company's cost margin, resulting in a dearth of competition under the

present Contract, and under future contracts as well. In the end, the public interest is best

served by protecting the process the government established in the first place and

retaining the confidentiality of Contract pricing. This preserves active competition in the

form of sealed bids and is fair to all competitors.

II.     **Cox Should not be Required to Post a Bond.**

        Fed. R. Civ. P. 65(c) provides that security may be required of the party awarded

injunctive relief in an amount sufficient to cover any costs and damages of a party that is

found to be wrongfully restrained. In this case, GSA will not be harmed if the temporary

restraining order is later determined to have been improvidently granted. The temporary

restraining order in this case would merely maintain the status quo until this Court has an

opportunity to hold a hearing on Cox's preliminary injunction motion, which will be filed

expeditiously. Accordingly, this Court should not require Cox to post any bond upon

issuance of a temporary restraining order.

## **CONCLUSION**

For all of the reasons set forth herein, Cox respectfully requests that this Court

grant Cox's application for a temporary restraining order.


Dated: April 6, 2006                                    Respectfully submitted,

                                                        David E. Mills
                                                        (D.C. Bar No. 401979)
                                                        W. Bradley Ney
                                                        (D.C. Bar No. 486363)
                                                        (D. D.C. Bar Application Pending)
                                                        DOW LOHNES & ALBERTSON, PLLC
                                                        1200 New Hampshire Ave., N.W.
                                                        Suite 800
                                                        Washington, DC 20036
                                                        Telephone: (202) 776-2000
                                                        Facsimile: (202) 776-2222